# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| IN RE YASMIN AND YAZ (DROSPIRENONE) MARKETING, SALES PRACTICES AND RELEVANT PRODUCTS LIABILITY LITIGATION | 3:09-md-02100-DRH-PMF <br><br> MDL No. 2100 <br><br> Judge David R. Herndon |
| MARLENE MELO, <br><br>         Plaintiff <br> vs. <br><br> BAYER HEALTHCARE PHARMACEUTICALS INC., a Delaware corporation; BAYER PHARMA AG, a German corporation; BARR LABORATORIES INC., a Delaware corporation; and TEVA PHARMACEUTICALS USA, INC., a Delaware corporation, <br><br>         Defendants. | COMPLAINT AND JURY DEMAND <br><br> Civil Action No.: 3:11-cv-12823-DRH-PMF |

Plaintiff, by and through counsel, and for her Complaint against Defendants, alleges as follows:

## PARTIES AND JURISDICTION

1.      Plaintiff Marlene Melo is a resident and citizen of Staten Island, located in Richmond County, New York.

2.      Plaintiff Marlene Melo was prescribed and ingested Yaz and Gianvi (the generic form of Yaz, and while using Gianvi she suffered a Pulmonary Embolism on December 25, 2010..

3.      Plaintiff alleges an amount in controversy in excess of Seventy-Five Thousand Dollars ($75,000.00), exclusive of interest and costs.

4.      Defendant Bayer Healthcare Pharmaceuticals, Inc. is a Delaware corporation, with its principal place of business at 5 West Belt Road, Wayne, New Jersey 07470.  Bayer Healthcare Pharmaceuticals, Inc. was created by the integration of Bayer Healthcare and a company formally known as Berlex Laboratories.  Defendant Bayer Healthcare Pharmaceuticals, Inc. is engaged in the business of research, developing, designing, licensing, manufacturing, distributing, supplying, selling, marketing, and/or introducing into interstate commerce, either directly or indirectly through third parties or related entities, its products, including the prescription drugs Yaz.  At all relevant times, Defendant Bayer Healthcare pharmaceuticals, Inc. conducted regular and sustained business in New York by selling and distributing its products throughout the state of New York and throughout the United States.

5.      Defendant Bayer Pharma AG is a foreign company headquartered in Berlin, Germany.  Bayer Pharma AG is the corporate successor to Schering AG, which was acquired by Bayer AG in 2006.  As a result of the acquisition, Schering AG was renamed Bayer Schering

Pharma AG.  As of July 1, 2011 Bayer Schering Pharma AG was renamed Bayer Pharma AG, as noted in 3rd Amended Case Management Order No. 9.   At all times relevant, Defendant Bayer Pharma AG, and/or its corporate predecessors, has been engaged in the business of researching, developing, designing, licensing, manufacturing, distributing, supplying, selling, marketing, and/or introducing into interstate commerce, either directly or indirectly through third parties or related entities, its products, including the prescription drugs Yaz.  At all relevant times, Defendant Bayer Pharma AG, and/or its corporate predecessors, conducted regular and sustained business in New York by selling and distributing its products throughout the state of New York and throughout the United States.

6.     Defendants, Bayer Healthcare Pharmaceuticals, Inc. and Bayer Pharma AG are jointly referred to herein as "Bayer" or "Bayer Defendants."

7.     Defendant Barr Laboratories, Inc. is a Delaware corporation with its principal place of business located at 225 Summit Avenue, Montvale, New Jersey 07645.  Barr Laboratories, Inc. is a division of Teva Pharmaceutical Industries Ltd., one of the largest generic pharmaceutical companies in the world.  Defendant Barr Laboratories, Inc. is engaged in the business of researching, developing, designing, licensing, manufacturing, distributing, supplying, selling, marketing, and/or introducing into interstate commerce, either directly or indirectly through third parties or related entities, its products, including the prescription drug Gianvi, which is a generic form of Yaz.  At all relevant times, Defendant Barr Laboratories, Inc. conducted regular and sustained business in New York by selling and distributing its products in New York and engaged in substantial commerce and business activity in Williamson County.

8.     Defendant Teva Pharmaceuticals USA, Inc. is a Delaware corporation with its principal place of business located at 1090 Horsham Road, North Wales, Pennsylvania 19454.

Teva Pharmaceuticals USA, Inc. is a wholly-owned subsidiary of Teva Pharmaceutical Industries Ltd. and is the company's operating business entity for the North American region and throughout the United States of America.  Defendant Teva Pharmaceuticals USA, Inc. is engaged in the business of researching, developing, designing, licensing, manufacturing, distributing, supplying, selling, marketing, and/or introducing into interstate commerce, either directly or indirectly through third parties or related entities, its products, including the prescription drug Gianvi, which is a generic form of Yaz.  Defendant Teva Pharmaceutical USA, Inc. lists Gianvi as one of its products on its website (www.tevausa.com) and in its Fall 2009 Product Catalog.  At all relevant times, Defendant Teva Pharmaceuticals USA, Inc. conducted regular and sustained business in Tennessee by selling and distributing its products in Tennessee and engaged in substantial commerce and business activity in Williamson County.

9.      Defendants Barr Laboratories, Inc. and Teva Pharmaceuticals, USA, Inc. are jointly referred to herein as "Barr" or "Barr Defendants."

10.     This court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties, and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

11.     This Court has personal jurisdiction over Defendants consistent with the United States Constitution as Plaintiff's claims arise out of Defendants' transaction of business and the commission of tortious acts within the State of Tennessee, and by virtue of Defendants' substantial, continuous and systematic contacts with the State of Tennessee unrelated to Plaintiff's claims.

12.     Venue in this district appropriate under 28 U.S.C. § 1391(a) and (c) because Defendants reside in this district and are subject to personal jurisdiction in this venue.

## FACTUAL BACKGROUND

### Nature of the Case

13.     Plaintiff Marlene Melo brings this case against Defendants for damages associated with her ingestion of the pharmaceutical drugs Yaz and Gianvi (ethinyl estradiol and drospirenone), which are oral contraceptives designed, manufactured, supplied, marketed, and distributed by the Bayer Defendants, and also Gianvi, which is the generic form of Yaz. Specifically, as a direct result of her use of Yaz and Gianvi, Plaintiff  Marlene Melo was diagnosed with a Pulmonary Embolism on December 25, 2010.

### Bayer's Combined Oral Contraceptives –Yaz

14.     Yaz is a birth control pills manufactured and marketed by Bayer.  Yaz is a combination oral contraceptives, or "COCs," meaning that it contains an estrogen component and a progestin component.  Together, these steroidal components work together in COCs to suppress ovulation, fertilization, and implantation and thus prevent pregnancy.

15.     Yaz was approved by the Food and Drug Administration for marketing in 2001 and 2006 respectively.

### Yaz Contains a "Fourth Generation" Progestin

16.     The estrogen component in Yaz is known generically as ethinyl estradiol.  The progestin component is known as drospirenone.  Yaz contains 0.02 milligrams of ethinyl  and 3 milligrams of drospirenone.

17.     Yaz is different from other combined hormonal birth control pills in that it contains drospirenone, a progestin that is unlike other progestins available in the United States and was never before marketed in the United States.

18.     Shortly after the introduction of combined oral contraceptives in the 1960's, doctors and researchers found that women using birth control pills had higher risk of blood clots, heart attacks, and strokes than women not using the pill.  As a result, the various brands of birth control pills were reformulated to reduce the amounts of estrogen.  As the amounts of estrogen levels reduced, so too did the risk of blood clots, heart attacks, and strokes.

19.     During this time, new progestins were being developed, which became known as "second generation" progestins (e.g. levonorgestrel).  These second generation progestins, when combined with the lower amounts of the estrogen, ethinyl estradiol, helped to reduce the risk of blood clots, heart attacks, and strokes and were considered safer for women.

20.     During the 1990's, new "third generation" progestins were developed. Unfortunately, these "third generation" progestins (e.g. gestodene and desogestrel) have been associated with a greater risk of blood clots in the deep veins (deep vein thrombosis or "DVT") and lungs pulmonary embolism or "PE").  As a result of the increased risk of blood clots, the FDA has required that products containing third generation progestins include a warning of the potentially increased risk of thrombosis.

21.     Yaz contains the same estrogen component, ethinyl estradiol, which has been used in the lower dose birth control pills for decades.

22.     However, drospirenone is a new type of progestin and is considered a "fourth generation" progestin.  No other birth control pills contain drospirenone, except for a recently approved generic version of Yaz marketed under the trade name Gianvi. The Associated Press and Reuters have also reported that the FDA approved a generic version of Yaz which was launched under the trade name Gianvi in June 2010.

23.     Since drospirenone is new, there are not decades of data available to support its safe use as there are with second generation progestins.  Studies that were done prior to FDA approval, however, indicate that drospirenone has certain effects that are different from traditional second generation progestins, and potentially more dangerous.

24.     One possible mechanism of action is that drospirenone interacts differently with ethinyl estradiol compared to other progestins, such that it does not sufficiently counterbalance the clotting effects of estrogen as do other progestins, particularly the second generation progestins.

25.     Another possible mechanism of action is that drospirenone causes an increase in potassium levels in the blood, which can lead to a condition known as hyperkalemia if the potassium levels become too high.

26.     Hyperkalemia can cause rhythm disturbances, such as extrasystolies, pauses, or bradycardia.  If left untreated, hyperkalemia can be fatal.

27.     If hyperkalemia disrupts the normal heart rhythms, the flow of blood through the heart can be slowed to the point that it permits blood clots to form.  Blood clots in the heart can then lead to heart attacks, or the clots can break off and travel to the lungs where they can cause pulmonary embolism, or can travel to the brain causing stroke.

28.     Indeed, during the brief time that Yaz has been sold in the United States, hundreds of reports of injury and death have been submitted to the FDA in association with Defendants' products.

29.     More recently, in September of 2009, two separate studies were published in the British Medical Journal concluding that there is an increased risk of venous thrombotic events associated with combined oral contraceptives containing drospirenone.

30.     One paper published in the British Medical Journal in September of 2009 entitled, *Hormonal contraception and risk of venous thromboembolism: national follow-up study*, concluded that oral contraceptives containing drospirenone were associated with a significantly higher risk of venous thrombosis than oral contraceptives containing levonorgestrel, a second generation progestin.

31.     The other paper published in the British Medical Journal in September of 2009 entitled, *The venous thrombotic risk of oral contraceptives, effects of oestrogen dose and progestogen type: results of the MEGA case-control study*, concluded that there was a 6.3 fold increased risk of venous thrombotic events associated with oral contraceptives containing drospirenone.

32.     In fact, in less than a five-year period, from the first quarter of 2004 through the third quarter of 2008, over 50 reports of death among users of Yaz have been filed with the FDA.

33.     These reports include deaths associated with cardiac arrhythmia, cardiac arrest, intracardiac thrombus, pulmonary embolism, and stroke in women in their child bearing years.

34.     Some deaths reported occurred in women as young as 17 years old.

35.     Significantly, reports of elevated potassium levels are frequently included among the symptoms of those suffering death while using Yaz.

### <u>Over-Promotion of Yaz</u>

36.     Defendants market Yaz as providing the same efficacy as other birth control pills in preventing pregnancy, but with additional benefits.

37.     However, because Yaz contain the fourth generation progestin drospirenone, they present additional health risks not associated with other birth control pills.

38.     More recently, Defendants advertised that its product Yaz was indicated for treatment of premenstrual syndrome or "PMS," as opposed to the less serious condition of premenstrual dysphoric disorder or "PMDD."

39.     Defendants also advertised that Yaz contained the added benefit of preventing or reducing acne.

40.     In response, on October 3, 2008, the FDA issued another warning letter to Defendant Bayer for the misleading advertisement, reiterating that the marketing was misleading because it promoted Yaz for medical conditions beyond the limits of the FDA approval, and adding that "Yaz has additional risks because it contains the progestin, drospirenone … which can lead to hyperkalemia in high risk patients, which may result in potentially serious heart and health problems."

41.     The FDA further warned in its October 3, 2008 letter that Yaz "does not result in completely clear skin" and that Defendants' "TV Ads misleadingly overstate the efficacy of the drug."

42.     Indeed, the FDA felt Defendants' over-promotion of Yaz was so severe that it required Bayer to run new TV advertisements to correct the previous misleading Yaz advertisements regarding acne and premenstrual syndrome.

43.     Bayer ultimately agreed to spend at least $20 million on corrective TV advertisements and to submit all Yaz advertisements to the FDA for advanced screening for the next six years.

44.     Most recently, on August 5, 2009, the FDA issued another warning letter to Defendant Bayer regarding the FDA's March 2009 inspection of Bayer's active pharmaceutical ingredient facility in Bergkamen, Germany.  In its letter, the FDA warned that based on its

inspection, Bayer's "quality management system fails to ensure that API's [active pharmaceutical ingredients] manufactured and released by [Bayer] meet established specifications." The active pharmaceutical ingredient drospirenone was specifically referred to by the FDA as one of the ingredients identified as manufactured and release out of specification.

45.     Thus, not only is there evidence based on published scientific literature that Yaz inherently present an increased risk of venous thrombotic events when compared to other oral contraceptives, but there is also evidence of potential manufacturing irregularities associated with Yaz.

**Bayer's Relationship with Barr Laboratories, Inc. and Gianvi, the Generic form of Yaz**

46.     Defendants Barr Laboratories, Inc. and Teva Pharmaceuticals USA, Inc. distribute, supply, sell, market, and/or introduce into interstate commerce, either directly or indirectly through third parties or related entities, the prescription oral contraceptive Gianvi, which is the generic form of Yaz.

47.     According to the publication Drug Topics, in 2008, while Yaz was ranked 28th and Gianvi was ranked 96th among the top 200 branded drugs by total prescriptions.

48.     Therefore, both the Bayer Defendants and the Barr Defendants have benefited and will continue to benefit economically in light of Gianvi's large market share, and they bear liability for any harm caused by the product. The Bayer Defendants and the Barr Defendants are collectively referred to herein as "Defendants".

49.     Additionally, pursuant to an agreement reached in June of 2008, Bayer has agreed to grant Barr a license to market a generic version of Yaz in the United States starting in July

2011. Under the agreement, Bayer will supply Barr with the product which Barr will market under a generic name.

### Plaintiff's Use of Yaz and Gianvi and Resulting Injuries

50.     As a result of Defendants' claim regarding the effectiveness and safety of  Yaz, and Gianvi, Plaintiff Marlene Melo's medical provider prescribed and Marlene Melo began using Yaz in or about July 1, 2008. Plaintiff Marlene Melo subsequently began using Gianvi when it became available.  Plaintiff Marlene Melo used Yaz and Gianvi through December 1, 2010. Plaintiff ultimately suffered a Pulmonary Embolism on December 25, 2010.

51.     Plaintiff Marlene Melo was hospitalized as a result of her use of Yaz and Gianvi and resulting Pulmonary Embolism.

52.     As a direct and proximate result of using Yaz and Gianvi, Plaintiff Marlene Melo suffered the injuries described above.

53.     Prior to Plaintiff's use of Yaz and Gianvi, Defendants knew or should have known that the use of Yaz and Gianvi created a higher risk of blood clots than other oral contraceptives on the market, including by not limited to second generation oral contraceptives, and that, when taken as directed, such use was unreasonably dangerous to consumers.

54.     Therefore, at the time Plaintiff used Yaz and Gianvi, Defendants knew or should have known that the use of  Yaz and Gianvi created an increased risk to consumers of serious personal injury, including deep vein thrombosis, pulmonary embolism, heart attacks, stroke, and even death.

55.     Despite the fact that Defendants knew or should have known of the serious health risks associated with the use of  Yaz and Gianvi, Defendants failed to adequately warn Plaintiff and/or her health care providers of said serious risks before she used the product.

56.     Had Plaintiff and/or her health care providers known of the increased risks and dangers associated with Yaz and Gianvi, she would not have used the product and would not have suffered the injuries described above.

57.     As a direct and proximate result of her use of Yaz and Gianvi, Plaintiff Marlene Melo has suffered significant harm, conscious pain and suffering, physical injury and bodily impairment, which may have caused permanent effects, and which may continue in the future to cause her physical effects and damage which will affect her throughout her lifetime.

58.     Further, as a direct and proximate result of her use of Yaz and Gianvi, Plaintiff Marlene Melo has suffered significant mental anguish and emotional distress and will continue to suffer physical limitations, pain, injury, damages, harm, and mental and emotional distress in the future.

59.     Plaintiff Marlene Melo has also incurred medical expenses and other economic harm and will likely continue to incur such expenses in the future, as a direct and proximate result of her use of Yaz and Gianvi.

60.     Plaintiff did not discover, nor did she have any reason to discover that her injury was a result of a defective drug and/or the wrongful conduct of Defendants, as set forth herein, until she spoke with legal counsel, which occurred within a year and a half before the filing of this complaint.

## FIRST CAUSE OF ACTION

### Strict Products Liability
### Defective Manufacturing

61.     Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further alleges as follows.

11

62.     Defendants are the manufacturers, designers, distributors, sellers, and/or suppliers of Yaz and Gianvi.

63.     The Yaz and Gianvi oral contraceptives manufactured, designed, sold distributed, supplied, and/or placed in the stream of commerce by Defendants was defective in its manufacture and construction such that it was unreasonably dangerous, was not fit for the ordinary purpose for which it was intended, and/or did not meet the reasonable expectations of an ordinary consumer.

64.     The Yaz and Gianvi oral contraceptives manufactured, designed, sold, distributed, supplied and/or placed in the stream of commerce by Defendants, was defective in its manufacture and construction as described at the time it left the Defendants' control.

65.     As a direct and proximate result of Plaintiff's use of  Yaz and Gianvi as manufactured, designed, sold, supplied, and introduced into the stream of commerce by Defendants, Plaintiff  Marlene Melo suffered personal injury, economic, and non-economic damages, and will continue to suffer such harm, damages, and economic loss in the future.

66.     Defendants' conduct as alleged in this Complaint demonstrates that Defendants acted maliciously, wantonly, or with recklessness suggesting an improper motive so as to warrant the imposition of punitive damages.

<u>**SECOND CAUSE OF ACTION**</u>

**Strict Products Liability
Defect in Design or Formulation**

67.     Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further alleges as follows.

68.     Defendants are the manufacturers, designers, distributors, sellers, or suppliers of Yaz and Gianvi.

12

69.     The Yaz and Gianvi oral contraceptives manufactured, designed, sold, distributed, supplied, and/or placed in the stream of commerce by Defendants was defective in its design such that it was unreasonably dangerous, was not fit for the ordinary purpose for which it was intended, and/or did not meet the reasonable expectations for an ordinary consumer.

70.     At the time Defendants manufactured, designed, distributed, sold, and/or supplied the Yaz and Gianvi oral contraceptives into the stream of commerce, a safer, more practical, alternative design was available.

71.     The Yaz and Gianvi oral contraceptives manufactured, designed, sold, distributed, supplied, and/or placed in the stream of commerce by Defendants, was defective in design as described above at the time it left the Defendants' control.

72.     As a direct and proximate result of Plaintiff's use of Yaz and Gianvi as manufactured, designed, sold, supplied, and introduced into the stream of commerce by Defendants, Plaintiff Marlene Melo suffered personal injury, economic, and non-economic damages, and will continue to suffer such harm, damages, and economic loss in the future.

73.     Defendants' conduct as alleged in this Complaint demonstrates that Defendants acted maliciously, wantonly, or with recklessness suggesting an improper motive so as to warrant the imposition of punitive damages.

### THIRD CAUSE OF ACTION

**Strict Products Liability**
**Defect Due to Inadequate Warning**

74.     Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further alleges as follows.

75.     Defendants are the manufacturers, designers, distributors, sellers, or suppliers of Yaz and Gianvi.

76.     The Yaz and Gianvi oral contraceptives manufactured and supplied by Defendants was defective due to inadequate warning or instruction, because Defendants knew or should have known that the product was unreasonably dangerous in that it created a substantial increased risk of serious bodily harm and death to reasonably foreseeable consumers such as Plaintiff Marlene Melo, and Defendants failed to adequately warn consumers and/or their health care providers of such increased risk.

77.     The Yaz and Gianvi oral contraceptives manufactured and supplied by Defendants was also defective due to inadequate post-marketing warning or instruction, because, after Defendants knew or should have known of the risk of serious bodily harm and death from the use of Yaz and Gianvi, Defendants failed to provide adequate warning to consumers and/or their health care providers of the product, knowing the product could cause serious injury and death.

78.     As a direct and proximate result of Plaintiff's use of Yaz and Gianvi as manufactured, designed, sold, supplied and introduced into the stream of commerce by Defendants, Plaintiff Marlene Melo suffered personal injury, economic and non-economic damages, and will continue to suffer such harm, damages, and economic loss in the future.

79.     Defendant's conduct as alleged in this Complaint demonstrates that Defendants acted maliciously, wantonly, or with recklessness suggesting an improper motive so as to warrant the imposition of punitive damages.

## FOURTH CAUSE OF ACTION

**Strict Products Liability**
**Defect Due to Nonconformance with Representations**

80.     Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further alleges as follows.

81.     Defendants are the manufacturers, designers, distributors, sellers, or suppliers of Yaz and Gianvi, and they made representations regarding the character or quality of Yaz and Gianvi.

82.     The Yaz and Gianvi oral contraceptives manufactured and supplied by Defendants was defective in that, when it left the hand of Defendants, it did not conform to representations made by Defendants concerning the product.

83.     Plaintiff Marlene Melo justifiably relied upon Defendants' representations regarding the Yaz and Gianvi oral contraceptives when she used Yaz and Gianvi.

84.     As a direct and proximate result of Plaintiff's use of Yaz and Gianvi and her reliance on Defendants' representations regarding the character and quality of Yaz and Gianvi, Plaintiff Marlene Melo suffered personal injury, economic and non-economic damages, and will continue to suffer such harm, damages, and economic loss in the future.

85.     Defendants' conduct as alleged in this Complaint demonstrates that Defendants acted maliciously, wantonly, or with recklessness suggesting an improper motive so as to warrant the imposition of punitive damages.

## FIFTH CAUSE OF ACTION

### Strict Products Liability
### Defect Due to Failure to Adequately Test

86.     Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further alleges as follows.

87.     Defendants advised consumers and the medical community that Yaz and Gianvi contained the same safety profile as other oral hormonal birth control pills.  However, Defendants failed to adequately test the safety of Yaz and Gianvi versus other oral hormonal birth control pills.

88.     Had Defendants adequately tested the safety of Yaz and Gianvi versus other oral hormonal birth control pills and disclosed the results to the medical community or the public, Plaintiff would not have used, and her physician would not have prescribed, Yaz and Gianvi.

89.     As a direct and proximate result of Defendants' failure to adequately test the safety of Yaz and Gianvi versus other oral hormonal birth control pills, Plaintiff Marlene Melo suffered personal injury, economic and non-economic damages, and will continue to suffer such harm, damages, and economic loss in the future.

90.     Defendants' conduct as alleged in this Complaint demonstrates that Defendants acted maliciously, wantonly, or with recklessness suggesting an improper motive so as to warrant the imposition of punitive damages.

## SIXTH CAUSE OF ACTION

### Negligence

91.     Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further alleges as follows.

92.     Defendants had a duty to exercise reasonable care in the manufacture, design, sale, distribution, supply, marketing, and/or placement of Yaz and Gianvi into the stream of commerce, including a duty to ensure that its product did not pose a significantly increased risk of bodily harm and adverse events.

93.     Defendants failed to exercise ordinary care in the design, formulation, manufacture, sale, testing, quality assurance, quality control, labeling, marketing, promotions, and distribution of Yaz and Gianvi into interstate commerce in that Defendants knew, or should have known, that the product caused such significant bodily harm or death and was not safe for use by consumers.

94.     Defendants also failed to exercise ordinary care in the labeling of Yaz and Gianvi and failed to issue to consumers and/or their health care providers adequate warnings of the increased risk of serious bodily injury or death due to the use of Yaz and Gianvi.

95.     Despite the fact that Defendants knew or should have known that Yaz and Gianvi posed a serious increased risk of bodily harm to consumers, Defendants continued to manufacture and market Yaz and Gianvi for use by consumers.

96.     Defendants knew or should have known that consumers, such as Plaintiff Marlene Melo, would foreseeably suffer injury as a result of Defendants' failure to exercise ordinary care as described above.

97.     As a direct and proximate result of Defendants' negligence, Plaintiff Marlene Melo suffered personal injury, economic and non-economic damages, and will continue to suffer such harm, damages, and economic loss in the future.

98.     Defendants' conduct as alleged in this Complaint demonstrates that Defendants acted maliciously, wantonly, or with recklessness suggesting an improper motive so as to warrant the imposition of punitive damages.

## **SEVENTH CAUSE OF ACTION**

### **Breach of Express Warranty**

99.     Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further alleges as follows.

100.    Defendants expressly warranted that Yaz and Gianvi were safe and effective prescription oral contraceptives

101.    The Yaz and Gianvi birth control products manufactured and sold by Defendants did not conform to these express representations because it caused serious injury to consumers who used the product when taken in the recommended dosages.

102.    As a direct and proximate result of Defendants' breach of warranty, Plaintiff Marlene Melo suffered personal injury, economic and non-economic damages, and will continue to suffer such harm, damages, and economic loss in the future.

103.    Defendants' conduct as alleged in the Complaint demonstrates that Defendants acted maliciously, wantonly, or with recklessness suggesting an improper motive so as to warrant the imposition of punitive damages.

## EIGHTH CAUSE OF ACTION

### Breach of Implied Warranty

104.    Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further alleges as follows.

105.    At the time Defendants manufactured, marketed, sold, and distributed Yaz and Gianvi, Defendants knew of the use for which Yaz and Gianvi was intended and impliedly warranted Yaz and Gianvi to be of merchantable quality, fitness, and safe for such use.

106.    Plaintiff Marlene Melo and her health care provider reasonably relied upon the skill and judgment of Defendants as to whether Yaz and Gianvi was of merchantable quality and safe for its intended use and upon Defendants' implied warranty as to such matters.

107.    Contrary to the implied warranty, Defendants' product Yaz and Gianvi was not of merchantable quality or safe for its intended use, because it was unreasonably dangerous as described herein.

108.    As a direct and proximate result of Defendants' breach of warranty, Plaintiff Marlene Melo suffered personal injury, economic and non-economic damages, and will continue to suffer such harm, damages, and economic loss in the future.

109.    Defendants' conduct as alleged in this Complaint demonstrates that Defendants acted maliciously, wantonly, or with recklessness suggesting an improper motive so as to warrant the imposition of punitive damages.

## NINTH CAUSE OF ACTION

### Negligent Misrepresentation and/or Fraud

110.    Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further alleges as follows.

111.    Defendants are the manufacturers, designers, distributors, sellers or suppliers of Yaz and Gianvi and, while engaged in the course of such business, made representations to Plaintiff and her physician regarding the character and/or quality of Yaz and Gianvi for guidance in their decision to select Yaz and Gianvi for Plaintiff's use.

112.    Specifically, Defendants represented that their product was just as safe, and just as effective or more effective, than other birth control products on the market.

113.    Defendants' representations regarding the character or quality of Yaz and Gianvi were untrue.

114.    Defendants had actual knowledge based upon studies, published reports and clinical experience that its products Yaz and Gianvi created an unreasonable increased risk of serious bodily injury and death to consumers, or should have known such information.

115.    Defendants negligently and/or intentionally misrepresented or omitted this information in its product labeling, promotions and advertisements and instead labeled, promoted

and advertised its product as safe and effective in order to avoid losses and sustain profits in its sales to consumers.

116.    In supplying the false information, Defendants failed to exercise reasonable care or competence in obtaining or communicating information to their intended recipients, including Plaintiff and her physician.

117.    Plaintiff Marlene Melo and her physician reasonably relied to her detriment upon Defendants' misrepresentations and/or omissions in its labeling, advertisements, and promotions concerning the serious risks posed by the product.  Plaintiff Marlene Melo reasonably relied upon Defendants' representations to her and/or her health care providers that Yaz and Gianvi were just as safe and effective as other types of oral contraceptives for human consumption and/or use and that Defendants' labeling, advertisements and promotions fully described all known risks of the product.

118.    As a direct and proximate result of Defendants' negligence and/or intentional misrepresentations, Plaintiff Marlene Melo suffered personal injury, economic and non-economic damages, and will continue to suffer such harm, damages, and economic loss in the future.

119.    Defendants' conduct as alleged in this Complaint demonstrates that Defendants acted maliciously, wantonly, or with recklessness suggesting an improper motive so as to warrant the imposition of punitive damages.

## TENTH CAUSE OF ACTION

### Violation of Consumers Legal Remedies Act

120.    Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further alleges as follows.

121.    Defendants knew, or in the exercise of reasonable care should have known, that Yaz and Gianvi were not reasonably safe as designed, manufactured, tested, marketed and distributed.

122.    Defendants knew that Yaz and Gianvi carried the increased risk of serious adverse events, including thrombotic injuries such as blood clots, pulmonary emboli, and strokes.

123.    Defendants' actions, representations, and/or omissions constitute unfair or deceptive acts or practices within the meaning the Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750 *et seq*.

124.    By reason of the foregoing, Plaintiff was and will be caused bodily injury, pain, suffering, and economic loss.

**WHEREFORE,** Plaintiff prays for relief as follows:

1.    Compensatory damages in excess of the jurisdictional amount, including, but not limited to pain, suffering, emotional distress, loss of enjoyment of life, and other non-economic damages in an amount to be determined at trial of this action;

2.    Medical expenses and other economic damages in the amount to be determined at trial of this action;

3.    Punitive and exemplary damages;

4.    Attorneys' fees, expenses, and costs of this action; and

5.    Such further relief as this Court deems necessary, just, and proper.

Dated: September 2, 2011                    RESPECTFULLY SUBMITTED,

By:    /s/ A.J. De Bartolomeo

A. J. De Bartolomeo
**GIRARD GIBBS LLP**
601 California Street, 14th Floor

San Francisco, CA 94108
Tel: (415) 981-4800
Fax: (415) 981-4846
ajd@girardgibbs.com
Attorney for Plaintiff

Michael S. Danko
**THE DANKO LAW FIRM**
247 N. San Mateo Drive
San Mateo, CA  94401
Telephone: (650) 342-6100
Facsimile: (650) 342-3483
Attorney for Plaintiff

### JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.